IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| JOLENE FERGUSON, | ) | CASE NO. 3:20CV1584 |
| | ) | |
| Plaintiff, | ) | |
| | ) | JUDGE JEFFREY J. HELMICK |
| v. | ) | |
| | ) | MAGISTRATE JUDGE |
| | ) | KATHLEEN B. BURKE |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY ADMINISTRATION, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Defendant. | ) | |

Plaintiff Jolene Ferguson ("Ferguson") seeks judicial review of the final decision of Defendant Commissioner of Social Security ("Commissioner") denying her applications for disability insurance benefits ("DIB") and supplemental security income ("SSI"). Doc. 1. This Court has jurisdiction pursuant to 42 U.S.C. § 405(g). This matter has been referred to the undersigned Magistrate Judge for a Report and Recommendation pursuant to Local Rule 72.2(b)(1).

For the reasons explained more fully below, the undersigned recommends that the Court **AFFIRM** the Commissioner's decision.

**I. Procedural History**

Ferguson filed applications for DIB and SSI in September 2017, alleging a disability onset date of February 6, 2006. Tr. 10, 251, 258. She alleged disability based on the following: asthma, COPD, Osgood-Schlatter syndrome, degenerative disc disease, extreme arthritis, obesity, and generalized anxiety disorder. Tr. 316. After denials by the state agency initially (Tr. 131, 132) and on reconsideration (Tr. 167, 168), Ferguson requested an administrative hearing. Tr. 201. A hearing was held before an Administrative Law Judge ("ALJ") on April 16,

2019. Tr. 40-78. At the hearing, Ferguson amended her disability onset date to July 11, 2013. Tr. 45. In her May 30, 2019, decision (Tr. 10-26), the ALJ determined that there are jobs that exist in significant numbers in the national economy that Ferguson can perform, i.e., she is not disabled. Tr. 24-25. Ferguson requested review of the ALJ's decision by the Appeals Council (Tr. 248) and, on May 15, 2020, the Appeals Council denied review, making the ALJ's decision the final decision of the Commissioner. Tr. 1-3.

## II. Evidence

### A. Personal and Vocational Evidence

Ferguson was born in 1969 and was 43 years old on her alleged onset date. Tr. 251. She has an eleventh grade education. Tr. 53. She previously worked as a short order cook and caretaker. Tr. 49-50.

### B. Relevant Medical Evidence[1]

On March 1, 2013, Ferguson established care at Terra Nova Medical Clinic because her previous doctor had moved. Tr. 554-555. She saw Dr. Iboaya, M.D. and complained of physical pain and anxiety. Upon exam, she was in no acute distress, had a normal and appropriate affect, and no other mental health conditions were noted. Dr. Iboaya prescribed Xanax, as Ferguson had stated that she had previously taken it. She followed up the next week for physical issues and no mental health concerns were reported or noted. Tr. 556-557.

On March 15, 2013, Ferguson saw Dr. Iboaya complaining of increased anxiety and stated that she was using twice the amount of Xanax that had been prescribed. Tr. 558-559. Dr. Iboaya's exam findings remained unchanged. Dr. Iboaya stated that it was okay for Ferguson to use Xanax twice a day but that, if she needs it more frequently, Dr. Iboaya would place a

---

[1] Ferguson only challenges the ALJ's decision with respect to her mental impairments. Thus, only the evidence regarding those impairments are summarized and discussed herein.

psychiatric referral.

On April 3, 2013, Ferguson saw Dr. Iboaya for physical complaints. Tr. 560. On May 6, Ferguson saw Dr. Iboaya for a Xanax refill and needing "disability paperwork filled out for back pain and leg pain." Tr. 562. She was feeling generally well. Dr. Iboaya's exam findings remained unchanged for both visits. Tr. 560, 562.

In June 2013, Ferguson saw Dr. Iboaya twice. First, for a medication refill, Tr. 564, and, second, to request weight loss medication, Tr. 566. At both visits she felt generally well and, upon exam, was in no acute distress and had a normal and appropriate affect. She returned in July for a medication refill and Dr. Iboaya noted the same exam findings. Tr. 568.

In September 2013, Ferguson saw Dr. Iboaya for physical complaints from working. Tr. 570-571. She returned in November for medication refills. Tr. 388-389. Dr. Iboaya's exam findings remained unchanged.

In March 2014, Ferguson saw Dr. Iboaya for a medication refill. Tr. 576. In May, Ferguson returned for medication refills and was "doing well otherwise." Tr. 482. Dr. Iboaya's findings remained unchanged at those visits and also in July, August, September, October and December when Ferguson saw her for medication refills and reported feeling generally well. Tr. 484, 486, 488, 490, 494.

In February 2015, Ferguson saw Dr. Iboaya and reported dealing with family-related stressors. Tr. 496. Upon exam, she was in no acute distress and had an appropriate affect and mood, no signs of depression, fluent speech, and intact comprehension. Tr. 497.

In March 2015, Ferguson saw Dr. Iboaya for physical pain due to a new job requiring her to stand or be "on her feet all day." Tr. 498. Upon exam, she was well groomed and in no acute distress. Tr. 499. In April, she visited for medication refills and was doing well otherwise and

feeling generally well. Tr. 500. Her exam findings were unchanged.

In August 2015, Ferguson saw Dr. Iboaya for medication refills and reported no mood changes. Tr. 504. Dr. Iboaya's examination remained unchanged, as they did at later visits in October (Tr. 506-07), November (Tr. 508-09) and February, March, and April 2016 (Tr. 510-513, 516, 518).

In May 2016, Ferguson saw Dr. Iboaya for medication refills and reported that she was dealing with a lot of stress and needed something in addition to her Xanax to help with anxiety. Tr. 520. Upon exam, she had a normal and appropriate affect and no other mental findings were noted. Dr. Iboaya added Effexor to her medications. Tr. 521.

In June 2016, Ferguson saw Dr. Iboaya three times. At her first visit she complained of knee pain, requested a note to be off work indefinitely, and had no other concerns. Tr. 522. At her second visit she complained of worsening knee pain. Tr. 524. At her third visit she reported having trouble focusing and requested a prescription for Adderall. Tr. 526. Dr. Iboaya did not provide an Adderall prescription and Ferguson declined a referral to a psychologist for an evaluation and treatment of attention deficit disorder. At each visit, Ferguson had a normal and appropriate affect and no other mental health findings were noted.

From July 2016 to July 2017, Ferguson continued to regularly see Dr. Iboaya for medication refills and did not complain of, nor did Dr. Iboaya remark upon, any mental limitations. Tr. 528-529, 530-531, 532-533, 534, 536-537, 538-539, 540, 542-543, 544-545, 546-547, 548-549, 550.

In September 2017, Ferguson saw Dr. Iboaya complaining of hot flashes, mood swings, irritability, and some associated depression. Tr. 552. Upon exam, she was in no acute distress, had a normal and appropriate affect, and no other mental limitations were noted. Tr. 553. She

4

was again prescribed Effexor. Tr. 553. Later that month, she returned for medication refills and was doing well otherwise. Tr. 1230. Upon exam, she was in no acute distress, had a normal and appropriate affect, and no other mental limitations were noted.

On January 4, 2018, Ferguson went to the emergency department because her nerves were bothering her too much. Tr. 924. She wanted a medication refill, explaining that she was in the process of changing providers and that she was out of her anti-anxiety medication. Tr. 924. Upon exam, she was in moderate distress because of anxiety and she had an anxious mood and normal affect and speech. Tr. 924.

### C. Opinion Evidence

#### 1. Consultative Examiner

On January 4, 2018, the same day she later presented to the emergency room because she was out of medication, Ferguson saw Dr. Griffiths, Psy.D., for a consultative examination. Tr. 456-462. When asked about the nature of her disability, Ferguson identified physical issues, and when asked if there were any further issues, "alluded to anxiety and depression." Tr. 457. She had never been psychiatrically hospitalized; she had, in the past, participated in counseling with a therapist; and she had been, but was not currently, on Xanax. Tr. 458. During the evaluation, Dr. Griffiths noted Ferguson refused to perform some of the examination-related tasks presented to her but displayed no other bizarre or unusual behaviors. Tr. 459, 460. He commented that her mood was depressed and irritable, she had an angry expression, and she was tearful. Tr. 460. She did not manifest indications of anger or hostility. Tr. 460. Dr. Griffiths diagnosed an unspecified depressive disorder and a panic disorder and commented that Ferguson's effort during the exam was "questionable" and that treatment records would be helpful in bolstering diagnostic credibility. Tr 461. He provided no conclusions about what Ferguson could do but

stated what he had observed her doing or what she told him she had experienced. Tr. 462.

### 2. State Agency Reviewing Physicians

On January 23, 2018, state agency psychologist Dr. Zeune, Psy.D., reviewed Ferguson's records and opined that Ferguson had a "depressive, bipolar, and related disordered" determinable impairment that was a "severe" impairment. She had "mild" limitations with respect to her ability to concentrate, persist, or maintain pace and adapt or manage herself, and no limitations understanding, remembering, or applying information and interacting with others. Tr. 108-109. Dr. Zeune did not provide further opinions on Ferguson's mental limitations.

On May 19, 2018, Dr. Richardson, Ph.D., adopted Dr. Zeune's findings except that he found her to have "moderate" limitations with respect to her ability to interact with others and adapt and manage herself. Tr. 140. Regarding her RFC, Dr. Richardson opined that Ferguson would be limited to superficial contact with others, she could have no frequent major changes, and she could adapt adequately to minor changes. Tr. 145. Dr. Richardson explained that Dr. Zeune's findings "did not factor in [Ferguson's] irritability and tearfulness and thus were not fully consistent with the evidence." Tr. 146.

### D. Testimonial Evidence

#### 1. Ferguson's Testimony

Ferguson was represented by counsel and testified at the administrative hearing. She testified that she has a driver's license but she does not drive very often or for very long because of physical problems. Tr. 48. She lives in a mobile home in a mobile home park by herself, but her adult daughter stays with her a few days a week. Tr. 52-53. She doesn't really mix with her neighbors; she minds her own business. Tr. 53. She gets along fine with one neighbor who lives behind her. Tr. 53.

Ferguson recounted her physical problems. Tr. 53-58, 65-66. When asked if she was having problems with anxiety and depression, Ferguson answered that she was. Tr. 59. She had been on medication but she no longer was. Tr. 59. Her doctor had taken her medication away; she told her she didn't need it and instead should use essential oils. Tr. 59. When asked if she had ever had counseling, Ferguson stated that she had, a few times about 6-8 months ago, but she gave up because the counselor was hard to get a hold of. Tr. 60. She conceded that she should have tried again to contact her because counseling may help. Tr. 60.

When asked what sort of problems she had with depression, Ferguson said she doesn't really know, but she gets upset and has crying outbursts. Tr. 60. When asked how often she cries, Ferguson stated that it happens when she's under pressure, when she is under stress, "just its all my nerves, it just gets to me" and she can't deal with it. Tr. 61. She described her anxiety as getting overwhelmed. Tr. 61. She feels like she can't breathe and she gets really nervous. Tr. 61. This has been happening to her a lot lately, 4-6 times over the last few weeks. Tr. 61. Usually she is a strong person but a lot of things are getting to her now. Tr. 61. When asked what brings on her feeling that she can't breathe and is nervous, Ferguson stated that she doesn't know. Tr. 62.

During the day, Ferguson watches television and reads books. Tr. 63. She doesn't have problems following what she is watching or reading. Tr. 63-64. When she is at the grocery store she does not have problems with other customers or store clerks. Tr. 64. She gets up and gets dressed every day. Tr. 67. Aside from her daughter visiting, her sons come by once in a while. Tr. 67. She stated that she couldn't perform her past work as a short order cook or caretaker because she has to lie down every now and then due to pain. Tr. 68.

### 3. Vocational Expert's Testimony

A Vocational Expert ("VE") testified at the hearing. The ALJ discussed with the VE Ferguson's past work. Tr. 70. The ALJ asked the VE to determine whether a hypothetical individual of Ferguson's age, education, and work experience could perform her past work or any other work if that person had the limitations subsequently assessed in the ALJ's RFC determination, described below. The VE answered that such an individual could not perform Ferguson's past work but could perform the following jobs that exist in significant numbers in the national economy: bench assembler, inspector, and packer. Tr. 71-72.

### III. Standard for Disability

Under the Act, 42 U.S.C. § 423(a), eligibility for benefit payments depends on the existence of a disability. "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .

42 U.S.C. § 423(d)(2).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations. The five steps can be summarized as follows:

1. If claimant is doing substantial gainful activity, he is not disabled.

2. If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3. If claimant is not doing substantial gainful activity, is suffering from a

      severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.

4. If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if claimant's impairment prevents him from doing past relevant work. If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5. If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520, 416.920;[2] *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987).

Under this sequential analysis, the claimant has the burden of proof at Steps One through Four. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at Step Five to establish whether the claimant has the vocational factors to perform work available in the national economy. *Id.*

### IV. The ALJ's Decision

In her May 30, 2019, decision, the ALJ made the following findings:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2023. Tr. 13.

2. The claimant has not engaged in substantial gainful activity since July 11, 2013, the alleged onset date. Tr. 13.

3. The claimant has the following severe impairments: obesity, lumbar degenerative disc disease, bilateral knee osteoarthritis, and chronic pulmonary disease (COPD). Tr. 13.

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the

---

[2] The DIB and SSI regulations cited herein are generally identical. Accordingly, for convenience, further citations to the DIB and SSI regulations regarding disability determinations will be made to the DIB regulations found at 20 C.F.R. § 404.1501 et seq. The analogous SSI regulations are found at 20 C.F.R. § 416.901 et seq., corresponding to the last two digits of the DIB cite (i.e., 20 C.F.R. § 404.1520 corresponds to 20 C.F.R. § 416.920).

9

      listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.  Tr. 17.

5.     The claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) in that the claimant can lift, carry, push and pull 20 pounds occasionally and 10 pounds frequently.  She can sit for 6 hours out of an 8-hour workday and can stand and/or walk for 6 hours out of an 8-hour workday.  However, she must have the ability to alternate between sitting and standing, at her option, every 20 minutes for 1-2 minutes so long as she is not off task or has to leave the vicinity of the workstation.  The claimant can never climb ladders, ropes, or scaffolds, can never crawl, and can occasionally climb ramps and stairs, balance, crouch, kneel and stoop.  She can have occasional exposure to extreme cold, heat and humidity along with dust, fumes, odors, gasses and other pulmonary irritants.  She cannot work around unprotected heights or unprotected moving mechanical machinery.  Tr. 17.

6.     The claimant is unable to perform any past relevant work.  Tr. 24.

7.     The claimant was born in 1969 and was 36 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date.  Tr. 24.

8.     The claimant has a limited education and is able to communicate in English.  Tr. 24.

9.     Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferrable job skills.  Tr. 24.

10.     Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform.  Tr. 24.

11.     The claimant has not been under a disability, as defined in the Social Security Act, from July 11, 2013, through the date of this decision.  Tr. 25.

### V. Plaintiff's Arguments

Ferguson argues that the ALJ erred at step two when she did not find her mental health impairments to be "severe" and did not provide for mental health limitations in her RFC assessment.  Doc. 13, 17.

## VI. Law & Analysis

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record. 42 U.S.C. § 405(g); *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.,* 889 F.2d 679, 681 (6th Cir. 1989) (per curiam) (citations omitted)). A court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

Ferguson argues that the ALJ erred because she did not find her mental impairments to be "severe" at step two and did not include any mental limitations in her RFC assessment. Doc. 13, p. 6; Doc. 17, p. 2. She concedes that an error at step two is harmless so long as the ALJ is able to consider the claimant's non-severe impairment when assessing the RFC. *See Maziarz v. Sec'y of Health & Hum. Servs.*, 837 F.2d 240, 244 (6th Cir. 1987); *Nejat v. Comm'r of Soc. Sec.*, 359 F. App'x 574, 577 (6th Cir. 2009); Doc. 17, p. 2. Here, the ALJ considered Ferguson's mental impairments and explained why she did not include any limitations in her RFC assessment. Therefore, the ALJ did not err.

The ALJ detailed the following when she determined that Ferguson's mental impairments were not severe impairments:

- Ferguson had been diagnosed with ADHD in June 2016 after she complained of difficulty focusing the past few weeks and reported that she had tried Adderall her friend had been prescribed and found that it helped. She asked her doctor for an Adderall prescription, but the doctor did not prescribe Adderall, and Ferguson

11

    declined a referral for evaluation and treatment for ADHD. No further records document that diagnosis and it does not appear again in the record.

- Regarding Ferguson's anxiety, depression, and panic disorder, she was prescribed Xanax in May 2014 for anxiety. In May 2016 she reported a lot of stress and requested additional medication and was prescribed Effexor, which she later stopped taking. Between November 2013 and September 2017 her exam findings were normal. In September 2017 she reported mood swings, irritability and associated depression, and was again prescribed Effexor. In November 2017 she went to the emergency room requesting Xanax because her doctor had stopped seeing her and she was out of her medication, and she was given a 7-day refill.

- In January 2018 she had a consultative exam and refused to answer some questions and perform some tasks. Her remote recall was adequate and she was able to follow the questions and did not ask for clarification or anything to be repeated. She was depressed and irritable with an angry expression, although she did not indicate anger or hostility. Her effort during the exam was described as "questionable." At the time she was out of her medication, and she presented later to an emergency room to get more Xanax, stating that she was in between doctors. There are no further treatment notes in the record, and Ferguson testified that she had not been on medication for a long time and she is not in counseling.

Tr. 14-15. The ALJ then considered the paragraph B criteria, i.e., the four broad areas of mental functioning, as follows:

- In understanding, remembering, or applying information, Ferguson has a mild limitation. At her psychological consultative exam her remote memory was intact and she had some errors in her short-term memory, but at her physical consultative exam her long- and short-term memory recall was not impaired. She uses a computer and reads.

- In interacting with others, Ferguson has a mild limitation. Although she was irritable during her consultative exam and refused to fully participate and had stated that she withdraws from others, she also stated that she has had no problems getting along with others (while shopping and performing prior work) and her adult children visit her regularly.

- In concentrating, persisting, and maintaining pace, Ferguson has no limitation. She has not alleged an inability to function in this area and her one complaint of difficulty focusing, described above, does not appear elsewhere in the record. Her attention span was noted to be adequate and she did not have problems following the conversation during her consultative examinations.

- In adapting and managing oneself, Ferguson has a mild limitation. Although she stated that she had crying spells and nervousness and was tearful at her

>consultative exam, she had arrived on time appropriately dressed and groomed, and she lives alone, pays her own bills, and cares for herself.

Tr. 15-16. Thus, the ALJ followed the proper procedure at step two when determining whether Ferguson's mental impairments were severe. *See* 20 C.F.R. §404.1520a(d)(1) (when determining the severity of a medically determinable impairment, "If we rate the degrees of your limitation [in the four areas of functioning] as 'none' or 'mild,' we will generally conclude that your impairment(s) is not severe, unless the evidence otherwise indicates that there is more than a minimal limitation in your ability to do basic work activities.").

Later in her decision, when explaining her RFC assessment, the ALJ recounted Ferguson's testimony, including the fact that she had not received mental health treatment for some time and that she had not pursued such treatment. Tr. 18. The ALJ remarked that in November 2017, when Ferguson saw her doctor for medication refills and to fill out her disability paperwork, she reported no mental health symptoms and denied mood changes. Tr. 21.

The ALJ commented that the psychological consultative examiner's opinions were unpersuasive because they were vague and based primarily upon Ferguson's self-reported symptoms. Tr. 22. Her effort during the exam was deemed to be "questionable" and she was "not 'especially well-motivated to participate.'" She was not on medication or in counseling at that time and she remained unmedicated and without counseling at the time of the hearing. She had had benign mental health examinations throughout the period of record.

The ALJ discussed the state agency reviewers' opinions. Tr. 23. The ALJ remarked upon the initial reviewer's finding that Ferguson had no more than mild limitations in all of the four areas of functioning, which, the ALJ concluded, was consistent with the record as a whole, noting Ferguson's benign exam findings and the fact that she was not on medication, not in counseling, and had never been evaluated by a psychiatrist. Tr. 23. The ALJ noted that the

13

reviewer at the reconsideration level had found that Ferguson had moderate limitations interacting with others and adapting and managing oneself, but the ALJ discounted that opinion because it was inconsistent with the record as previously recounted. Tr. 23.

In sum, the ALJ did not err when she determined that Ferguson's mental impairments were not severe at step two because she followed the appropriate guidelines for assessing her mental impairments and she had an opportunity to, and did, consider her non-severe mental impairments when assessing the RFC. 20 C.F.R. § 404.1520a(d)(1); *Maziarz*, 837 F.2d at 244.

Although Ferguson identifies evidence in the record she believes supports her assertion that she had functional limitations due to her mental impairments, she does not describe an error by the ALJ. First, she references consultative examiner Dr. Griffith's opinion. Doc. 13, p. 8. However, she concedes that Dr. Griffith's opinion is vague (as the ALJ found) and that he did not, in fact, opine that Ferguson had any specific limitations. *See, e.g., Nolcox v. Berryhill*, 2019 WL 1331582, at *9 (N.D. Ohio Mar. 25, 2019) (physician's unequivocal statement that the claimant "may" require a limitation is not an affirmative finding).

Next, Ferguson complains that it is not clear why the ALJ deemed the opinion of the state agency reviewer upon reconsideration, Dr. Richardson, to be inconsistent with the record. Doc. 13, p. 8. The undersigned disagrees. Dr. Richardson opined that Ferguson had a moderate limitation in interacting with others and adapting and managing oneself. The ALJ repeatedly commented that there was no evidence that Ferguson had problems interacting with others, including her testimony in which she stated that she did not, and that she could adapt and manage herself as evidenced by the fact that she lived alone, cared for herself and paid her bills, and attended medical appointments on time and appropriately dressed and groomed. Tr. 16. Finally, the ALJ repeatedly stated that Ferguson routinely had benign exam findings and no longer took

14

mental health medication, did not attend counseling, and had never been evaluated by a psychiatrist. *See* 20 C.F.R. § 416.920c(b)(2) (ALJs "will explain how [they] considered the supportability and consistency factors for a medical source's medical opinions … in [their] determination or decision."). Moreover, the ALJ acknowledged the evidence upon which Dr. Richardson relied: that she was irritable and tearful at her consultative exam. Tr. 146, 15.

In her reply brief, Ferguson argues, for the first time, that the ALJ inappropriately relied on the fact that she was not receiving mental health treatment. Doc. 17, p. 3. That argument is waived because Ferguson raised it for the first time in her reply brief. *See Scottsdale Ins. Co. v. Flowers*, 513 F.3d 546, 553 (6th Cir. 2008) (issues raised for the first time in a reply brief are deemed waived and need not be considered by the court).[3] In any event, her argument fails. Ferguson cites *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 283 (6th Cir. 2009), in which the Sixth Circuit recognized that a mentally ill person's noncompliance with treatment "can be ... the result of the mental impairment itself and, therefore, neither willful nor without a justifiable excuse." In *White*, the Court found that there was no evidence in the record indicating why the claimant failed to seek treatment during a six-month period, and that it was reasonable for the ALJ to infer that the lack of treatment during that time indicated an alleviation of the claimant's symptoms. *Id*. at 284. Here, similarly, there is no evidence in the record indicating why Ferguson failed to seek treatment, and, therefore, it was reasonable for the ALJ to infer that the lack of treatment was willful and without justifiable excuse. *C.f., Ulh v. Comm'r of Social Sec.*, No. 1:20CV749, 2021 WL 2188303, at *10 (N.D. Ohio May 14, 2021)[4] (remanding because the evidence showed the claimant had depression causing apathy and suicidal ideation which, in

---

[3] Because the ALJ's decision is replete with references to Ferguson's numerous refusals to follow up with referrals and/or pursue treatment (of her physical as well as her mental impairments), a challenge to the ALJ's finding that Ferguson failed to pursue treatment is something Ferguson should have raised in her opening brief.

[4] Report and Recommendation adopted, 2021 WL 2187982 (N.D. Ohio May 28, 2021).

15

turn, caused her to go off all her medications, including her diabetic medication, resulting in hospitalizations; a provider had opined that the claimant's severe mental impairment caused her to go off her medications; and the ALJ failed to make a finding regarding the impact of that evidence).

Because Ferguson has not described an error on the part of the ALJ, the Commissioner's decision should be affirmed.

### VII. Conclusion

For the reasons set forth herein, the undersigned recommends that the Commissioner's decision be **AFFIRMED**.

Dated: June 29, 2021

*/s/Kathleen B. Burke*
Kathleen B. Burke
United States Magistrate Judge

### OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  Failure to file objections within the specified time may waive the right to appeal the District Court's order.  *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  *See also Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).